Please be seated. We'll next hear arguments in Long Beach Area Chamber of Commerce v. City of Long Beach. Wow, seems like a good list. Council ready? You may proceed. Thank you, Your Honor. Good afternoon. My name is Monty Matchett. I represent the City of Long Beach with regard to this matter. I want to begin, I want to make three points, and I want to begin at the beginning with the procedural issue that the City has raised in its brief, and that primarily involves the Chamber's appeal and whether it's timely. It's an important question, obviously, because if the appeal is not timely, this Court has no jurisdiction to entertain the matter. Moreover, this Court should decide the matter, if the Court can decide the matter, without deciding it on a constitutional basis, it should do so. The plain fact of the case is the Chamber did not get their appeal filed timely. They have not presented any explanation as to why they haven't, and they rely on an equity theory, which according to Bowles v. Russell, has no weight regarding the question of jurisdiction. So the first decision this Court should make is to deny, is to find that the appeal is untimely. Isn't there a more fundamental problem with the Chamber's appeal? Yes. That is, according to the stipulation, the stipulated facts, the Chamber doesn't make any independent expenditures, and its bylaws preclude it from doing so. So how does it have standing to challenge the Long Beach City Ordinance? I would agree with Your Honor, I don't believe that they do have standing. Did you ever make that argument to the District Court? We made that argument. I believe the argument was made to the District Court, I know it was made to this Court as well. The standing argument, that they don't have standing to challenge? I guess what I'm trying to figure out is what is the status of that underlying decision? The underlying decision, as it has been now characterized, pertained only to the Chamber. Do we have anything to review? The appeal was brought on behalf of the Chamber and on behalf of the PACs. Now, I realize that, but the PACs, you're arguing, their appeal is untimely. But the Chamber, your appeal is about the ruling on the Chamber. Correct. Well, was there a case or controversy to be decided there? No, I don't believe there is. I don't believe that the Chamber has standing insofar as they do not participate in electioneering activities, nor are they permitted to by their own bylaws. That was briefed, I believe, in the District Court, and it was briefed, albeit not extensively, in the briefs before this Court as well. So that argument has been made and preserved by the City of Long Beach. Yeah, I think you're on the same point. Preserved is something that you can waive. You can't waive standing. It doesn't matter whether it was made or preserved. I think you're being asked the question of the substance of that argument. Correct. Is there standing? No, I believe there is not standing. I believe the Chamber does not have standing to raise the issue. Do you want to argue the point or are you just going to say no? No, I believe you guys just missed the case. Okay. And they case that you're lying. You want to tell us why you think they don't have standing? Your Honor, I thought, yes, I would like to tell you why they don't have standing. They don't have standing. That's good. Thank you. Do you want to share that with me? Sure. They don't have standing, as I've tried to articulate, perhaps unarticulately, but they don't have standing in this case because they have no actual – they've not been harmed in any way by the statute. They do not participate in electionary – Is there any threat of future harm? Pardon me? Is there any threat of future harm, imminent threat of future harm? No, not in the record, Your Honor. The fact is the Chamber has been carrying on as a corporation for several years. They've never participated in electionary activities. They don't participate in election activities specifically because their bylaw is prohibited, and rather they participate through their facts, and that's how they participate and carry on electioneering. I see. And the record's clear on that? There's a stipulation that the only way they participate in – the only way they participate in campaign financing at all is through their facts? Electioneering activities, yes, is through their facts. That's part of the stipulated facts that the district court will submit to the district court. That's correct. We should pause here for a second. Do we have a water emergency? I guess. You may proceed. It's usually me who's supposed to acknowledge it. Thank you. I wanted to ask him about circumstances, but I appreciate that argument. Okay, so there's no standing, as you're saying, for the Chamber's position. Let's take that. Let's go with that. How would the PACs have known that they had suffered an adverse ruling before the district court entered its second order? Well, the district court would know that they suffered an adverse ruling by the language of the original order and the judgment that was ultimately filed, which expressly – well, I shouldn't say expressly, but implicitly enjoined. There's a difference between express and explicit. I think they're sort of opposites, right? They are opposites. It implicitly harmed the PACs. It detrimental to the PACs and the ruling insofar as the court enjoined the ordinance only as to the Chamber. So the only other option for the PACs, or the only other option available, was that it was not enjoined as to the PACs. But the court – The PACs knew at that instance that the court had ruled unfavorably as to them, and they knew at that point, or should have known, that they had an issue. You know, I'm sorry. I didn't follow that. You said the district court's judgment was as to the Chamber. It enjoined the ordinance as to the Chamber. As to the Chamber. It didn't say anything as to the PACs. Correct. It didn't say anything as to the plaintiffs. It said the Chamber. It said – and I don't recall the exact wording, but it said the Chamber and similarly situated groups. Why wasn't that simply an interlocutory ruling on one of the parties, which is not immediately appealable unless you get a 54-D severance? Because the district court had intended to rule on both summary judgments in its entirety. This judge said no. This judge said this is something I have not ruled on already when you entered the second order. The district court said that if it had not been explicit in its original order, and to the extent that it was not explicit, it will clarify now or it will give a more comprehensive ruling on the motion to clarify. That doesn't make sense because according to you, the district judge would have enjoined the whole thing as to both the ordinances to the Chamber and the PACs, right? Well, if the PACs and the Chamber had both been successful, yes, the ordinance would have been enjoined, and Long Beach would not be able to enforce the ordinance as against the PACs or against the Chamber. But the order explicitly said it was enjoined only as to the Chamber and similarly situated groups, meaning groups that collect membership fees. But what you want to derive from that is in that case, the district court entered a final decision against the PACs. Why isn't it equal to plausible inferences? I'm later going to rule on – I'm ruling as to one party right now. As to the parties which I'm not ruling on, that case is ongoing. At least the judges do that all the time. Correct. But if the judge were inclined to do that, it wouldn't do it through a Rule 60A motion. The court entertained a Rule 60A motion for the purpose of clarifying its earlier order because it was an error in how it articulated the order. If it instead had only partially ruled, it would have made a separate ruling on the summary judgment, which clearly it didn't do. So the district court certainly intended to rule on the entire matter, did not produce an order that was artful enough for us to glean that, responded in the clarification order. What a great civil procedure question. I don't know if Ken Graham is here, but I'm sure he'd really get excited if you were. He taught me civil procedure right here. Okay. Okay. So you're going on the premise that he issued his first ruling only as to the chamber. But here's what he actually says. He says the court rules, this is his first order. The court rules that Long Beach's ordinance is unconstitutional as applied to the plaintiffs. Well, who were the plaintiffs in this case? The plaintiffs were all four, the PACs and the chamber. But if you continue to read the order, it's clear that the order and the 10. That's the problem. The order is not clear. I mean, it's really not clear. And then you put in, it's internally inconsistent on that point. Then you put in, you submitted the proposed form of judgment, right? Right. And I don't have a copy. I thought I did. Thank you, Summer. Okay. The proposed form of judgment, what precise language did it use? Do you have it? No, I don't have it, Your Honor. I apologize. I can tell you, Your Honor. That's another cardinal rule. You should have the key documents, not rely on the judges to be bringing them to the court. Yes, Your Honor. It's okay. I'll find it. If you look at the order, Your Honor. Which order? The original order. It justifies the decision. And the rationale that it uses could only apply to the chamber. It could not apply to the PACs. Well, in fact, he actually ruled against the PACs. Exactly my point, Your Honor. He ruled against the PACs. So how would they know that from this order? Well, if they couldn't tell from the order, they have a remedy. They can timely file an appeal, or they can timely file a Rule 60A motion. They did neither. That's the problem. They could have sought some kind of clarification. And, in fact, that's the impetus of their equity argument. But as Russell v. Bowles clearly indicates, equity doesn't play any role in this. It's jurisdictional. They did not timely file the appeal. The bus is left. They're out of luck. Okay. Well, assuming we, just for the sake of argument, we don't buy that. Okay. We've heard your argument as to what do you have to say about the PACs. As to the PACs, we would take the position, the city would take the position, that the ordinance is a reasonable regulation, closely drawn to further important governmental interest, that the ordinance is not an expenditure limit, but a limit on contributions. How can it not be an expenditure limit? The exact limits is expenditures. Your Honor, the amount of money that an independent expenditure committee or an individual chooses to spend is not in any way dictated by the language of the ordinance. No, it's precluded. It's barred unless it's below a certain amount. The ordinance bars spending of money solicited in excess of a contribution limit. That doesn't mean that they can't spend money. It means that the more money they want to spend, the more sources they have to draw upon. They have to increase the number of donors, which, in fact, McConnell has recognized as a legitimate approach. But the only thing that governs is the money the entity, the PACs, spend with respect to elections. It doesn't say anything about contributions or anything of that sort. What it is is a limitation on that process. How can that not be a contribution? And hasn't the Supreme Court, going back all the way to Buckley, made a sharp distinction between contributions, independent expenditures, and contributions? It says if you don't coordinate, if you don't, if nothing cahoots basically with the candidate or you don't go to the director or coordinate with the candidate, the Constitution prohibits regulation. Why isn't this just a straight up and down Buckley issue? Two reasons. The first is that we maintain it's a contribution limit, but if you look at McConnell and Cal Med in those cases, the interest defined is much broader than Buckley looked at. It's not just a quid pro quo contribution to a candidate in exchange for some type of special consideration or special interest. In fact, McConnell is much broader, very broad in how it defines the interests the legislatures are seeking to guard against. The appearance of corruption, a sense of gratitude, and generally a weakening of the confidence in the electoral process by unlimited campaign contributions. So cases following Buckley have recognized that while there may be some incidental impact on expenditures ultimately, there is a legitimate interest, an important governmental interest in regulating contributions. But the rationale of McConnell was, first of all, it was a limitation on spending of soft money by political parties or their agents that they were discussing. And part of what they discussed was how, part of the rationale was that the national political parties were intimately intertwined with the candidates themselves. So the relationship between the spending and the candidate was very close. And so it wasn't, it could be controlled by, coordinated by, create the appearance of corruption or actual corruption. Because you can raise so much money, put it in the soft category, it's not regulated by the federal dollars limits. And I remember that, too. I remember that period of time when we'd get requests for donations for, you know, the national party committees. And so McConnell said, no, we're not going to do that. That relationship's just too close. Here we have an independent campaign expenditure committee. We have PACs. They interview the candidates. They decide which candidate is in their best interest. They spend their money according to their best interest. How does that come under McConnell? Where's the interconnection between the independent expenditure campaigns and the candidate? They don't control it.  That's correct, Your Honor. But McConnell recognized that the interest that's being protected is much broader than a close, intimate relationship. And McConnell not only did the statute bar campaign contributions to national committees, but also the local committees as well. Local political committees have virtually. To the extent that it was soft money. Correct, but a local or state committee has virtually, in most cases, will have virtually no connection or close intimate relation with a federal candidate. I mean, a county assessor or some other local official receiving money, soft money is not going to be able to funnel that back to a national candidate. Counsel, it seems to me this case turns on a philosophical dispute between money and politics. We have Justice Kennedy in his dissent, I guess, abruptly talking about this is part of the democratic process. I mean, suppose you have a proposed law and someone running for city council says, oh, that's a horrible law. Then a PAC spends thousands and thousands of dollars saying, boy, this law is wonderful. And a week later, the candidate for city council says, oh, I've changed my mind. I'm going to vote for it. Now, is this corruption or is this part of the democratic process? As the court articulated the hypothetical, that would be part of the political process. There's certainly nothing wrong or questionable about a politician or a candidate changing his mind or his opinion because of influence or. . . A lot of money was spent on those advertisements. Right. But what we're focusing on in this case, because, of course, the Long Beach ordinance does not limit expenditures to initiatives, only expenditures on behalf of candidates. And the difference is that with an expenditure to a candidate, even a small committee, and especially in a local election where very few votes are needed to win the election, a large amount of money then spent on mailers or other get-out-the-vote efforts in favor of one candidate or in favor of another will not go unnoticed by the politicians. It will not go unnoticed by the elected officials. And then you raise the very risks that McConnell and Calumet was concerned with that that candidate will feel a sense of obligation. In this case, for instance, the PACs interview every potential candidate before they commit money to that candidate. Money not going directly to the candidate, but money nevertheless being spent in favor of that candidate. Well, that's wrong. If you were a member of the Chamber of Commerce and they had affiliated PACs, wouldn't you want them to find out something about the candidates and interview them before they chose which one they were going to support? And they're not giving money to the candidate themselves. They're not allowed to do that. They're doing their own campaign on behalf of this particular person. I mean, I would think that's just sound business judgment to interview people before you support them. I would agree with you. It is a sound business judgment. Why is that some form of corruption? It's not necessarily a form of corruption. It's not necessarily a form of corruption. But the point I was trying to make in response to Judge Nelson's question is that there is a very intimate connection, even when there's an independent expenditure committee and a candidate for office. As Judge Nelson said, this turns on whether or not the independent expenditure committees and their efforts, although they're not in coordination with a candidate, although they're not controlled by a candidate, whether a candidate would feel a sense of obligation potentially. In the legislative judgment, in the judgment of the Congress, that happens. In the judgment of, and that was in the Cal Med case, where the judgment was that there could permissibly be limits on contributions to independent committees. So Congress believed in its collective judgment that this was an evil that needed to be approached, that even independent expenditure committees, through their spending of large funds, could raise this sense of obligation, the sense of gratitude on the part of candidates, which creates an appearance of corruption. So you view McConnell as having overruled Buckley to that extent? I don't. Remember in Buckley, the one thing they struck down in Buckley was the independent expenditure commission. You consider McConnell to have overruled that? No. I don't. My understanding of Buckley is that what it struck down was limits on expenditures. McConnell didn't deal with limits on expenditures, and neither does the Long Beach Ordinance deal with limits on expenditures. The PACs are free to spend as much as they want to spend on electioneering activities. This ordinance is directed towards limiting the contributions to those independent expenditure committees. So McConnell does not overrule Buckley. It amplifies the legitimate interests in light of the First Amendment that Congress and local legislators can't approach. So maybe the district court was wrong in its analysis that Lincoln Club didn't apply to the PACs because a large proportion of their monies comes from the dues paid to the Chamber of Commerce, and the dues are based, are predicated, and turn on the size of the number of employees each company has. So the Chamber of Commerce says we sometimes get 10,000 because the company that's the member has over X number of employees. That means if they apportion some of those dues to the PACs, which that's in the stipulated facts too, that that automatically means the PACs are barred from spending in your local races. Your Honor, my understanding of the facts of the case is that the Which case? This one or Lincoln Club? This one. Because I'm asking you to distinguish Lincoln Club. Correct, and the distinction is that in the Lincoln Club case, the PACs took their money from the membership dues. It flowed from the membership dues of the Lincoln Club into the PACs. In this case, the PACs independently, absent membership dues, solicit money from members. So it's like Emily's List. Yes, it's like Emily's List to the extent that the money solicited comes independent of any kind of membership dues. When a business joins the Chamber of Commerce. So are you suggesting that the PACs should be segregating their monies and as to that money that's raised through the Chamber, the ordinance wouldn't apply to it? As I understand your question, no. The PACs already segregate their money, all the money that they collect. Okay, so I'm just saying that the Chamber raises its, the Chamber receives membership dues based on the number of employees. A portion of that is given to the PACs. Are you saying your ordinance doesn't affect that portion? The ordinance would definitely affect that portion. Okay, then as to that portion, why doesn't Lincoln Club apply? It would. Lincoln Club would apply if it barred any expenditures by the PACs. But the way the PACs are funded in this particular case is they do not take membership dues. Rather, members join, pay money, and then are asked to contribute additional monies for the purpose of being put into a segregated PAC account. So that's the difference in Lincoln Club. Are you sure about that fact? Yes. Okay. Are you all right? Yes. Of course. I just want to ask quickly, your time is up. Should we hold this case until the Supreme Court decides Citizens United? I think Citizens United deals with one of the arguments we made as to the Austin line of cases that approach, and one of the arguments we made concerning the chamber as being a corporate and being treated differently since it's a corporation to the extent that the chamber has an outstanding and they weren't timely with their appeal. No, I don't think there's any reason why this court should delay. Thank you, Your Honor. Thank you, Your Honor. Okay. The amusement. Chief Judge Kudzinski, may it please the Court. I think I was the only one here for the Lincoln Club case. I argued that before Judge Goodwin, so if you have detailed questions, I can handle that. Let me take up the time. That's also in Orange County, isn't it? No, that's Long Beach. Long Beach is not in Orange County. Long Beach is not in Orange County. Although it is in Chapman's sphere of influence. It's the closest law school to Long Beach. We'll have to have a case involving the dean of UCLA when we send it to Chapman. There we go. Although he's about to become the dean of my alma mater. It's a small world. We have with us the former dean of another law school. Right. Thank you. Very good. USC. USC. Okay. It had to be said. Anyway, we'll set your clock back to 20 minutes. All right. Thank you. Can you clarify for me in the stipulated facts the source of the monies for the PACs? Yes. Page 103 of the Executive Record, paragraph 13 of the stipulated facts, some of the dues that are collected by the chamber can be directed to go into one or other of the PACs. So we are talking about the dues. And to that extent, certainly it comes under Lincoln Club for that reason. There's another reason it comes under Lincoln Club, and that is quite a part. Does it operate as an absolute ban on expenditures because of the contribution limits? Does it require them to restructure? And that's the second reason why the Lincoln Club court said it's subject to strict scrutiny. That's what I'm wondering. If you apply the EMILY's List analysis, their ordinance would preclude spending by the PACs of both dues and then the additional contributions. That's correct. So probably as to the dues, it would be unconstitutional. What about as to the additional contributions? Well, I would argue that it's unconstitutional as well for two reasons. One, the way the city ordinances work, if I collect from somebody else $650 to put in one of the PACs, or excuse me, $350, which is the city council cap, I can't spend, I can spend that much for city council raises. If I collect those $650, which I'm allowed to do for one of the mayoral raises, I can't then use that PAC, even if everything has been brought in at $650, to spend in a city council raise. I'm absolutely prohibited from that. And all of the infrastructure and the changes of the freedom of association rights, which is the other half of the Lincoln Club decision, in order to comply with these different regulations, is itself subject to strict scrutiny. And there's another Supreme Court case directly on point, Citizens Against Rent Control, the Berkeley case. It says when you're dealing with committees that are not giving money to candidates, in that instance it was an issue, it was a ballot initiative, the cap on the contributions amounts to a cap on the expenditures, as you would expect. And then for that reason, that was subjected to exacting scrutiny, the very thing that the Lincoln Club said. Does it make any difference in our analysis of the constitution and the statute as applied to the PACs, whether we apply the strict scrutiny, narrowly tailored, or whether we apply this lesser, closely drawn standard? I'm not sure what the distinction really is. Yeah, all we know is that it's not quite strict scrutiny, but it's more than intermediate scrutiny. As this court has previously said, it's still very rigorous scrutiny. It's got to be closely drawn to serve a sufficiently important governmental interest. And as both the D.C. Circuit and Emily's List just earlier this month, and the Fourth Circuit in the North Carolina Right to Life v. Leak case, both applied the lower level of scrutiny and said that contribution limits on contributions to independent expenditure committees are invalid, unconstitutional, even under that lower level of scrutiny. And I think that's true as well. Counsel, are you claiming there's not a sufficient governmental interest here? I'm not claiming... I'm just talking about closely drawn. I'm not talking about that there's not a sufficient governmental interest. Clearly, avoidance of quid pro quo corruption and the appearance of corruption qualify as a compelling governmental interest. It's not closely drawn, and it's certainly not narrowly tailored. It's not closely drawn because, as the Supreme Court has said repeatedly since Buckley, as Judge Kuczynski pointed out earlier, I can't restrict the independent expenditures themselves. The contributions to the independent expenditure committee are even one step further removed from the candidate and therefore further removed from the concern about quid pro quo corruption. And it makes no sense to say I can reach back even further. The Court drew the line between contributions to candidates and independent expenditures. And these are contributions to the independent expenditure committee. Let me ask you about this one-step back business. You could have a one-person PAC or a family PAC. So everybody knows that if you get money from the Eastman PAC, let's say, you know that the very wealthy, influential Eastman family would be behind it. So I'm not... The sort of second step seems to be a bit of a stretch. But I think that's addressed by Buckley as well because that individual could make the same independent expenditure on his own. Well, that's right. That's right. Sorry, that's the first step analysis. That's right. I'm not sure you'd get extra miles by the second step. Well, the point is how close am I to the concern about quid pro quo corruption? And if Mr. George Eastman makes a million-dollar contribution to influence an election, the Supreme Court and Buckley and the National Political Action Committee and repeatedly have said I can't restrict how much he spends on that independent expenditure. Even though the candidates are obviously going to be aware of it, the fact that there's no coordination means that our concern with quid pro quo corruption doesn't exist. Do you think Caperton overrules all of that? What's that? Do you think Caperton... No. ...overrules all of that? No. I thought it did. Well, Caperton is going to play out for many years. Look, I don't think... In many ways and in many theaters... In many ways people didn't anticipate. That's right. That was an essential case where you had no coordination. Why did these people have this campaign? Was it... It wasn't really supporting the judge. It was really opposing... He was opposing a sitting judge. He had actually been opposing him for years. This one happened to be opposing him in a case where a company that he was an officer, an employee in, not his own money, that case was on its way to the Supreme Court's docket in West Virginia. But the issue there was not whether he had an influence on the candidate. It's whether the judge had an obligation to recuse because of potential concerns there. I think the due process issue versus the First Amendment issue are sufficiently different. We don't need to get into the Caperton. So, counsel, you keep talking about quid pro quo corruption, but I don't think all of the justices see it so narrowly. I know Justice Kennedy does, but I don't think Justice Breyer did. And he wrote the majority in McConnell. And now, I mean, I don't think what they have to show is that the ordinance furthers their interest in eliminating quid pro quo corruption as of now. I don't think that's the state of the law. No, that's right. It's broader than that. It's broader than that. So, aren't they really saying that this independent expenditure campaign thing, and particularly in California, it's gotten way out of hand. You line them up on one side or the other. Everyone knows they're actually aligned with individual candidates, and they do it by a wink and a nod. Now, maybe that's what he's arguing. I don't know if he's got evidence in the record to support that. But isn't that what he's really arguing, is the independence? Well, he is. Is it corruption? But, you know, if that's what he's arguing, then he still doesn't meet the closely drawn and certainly not the narrowly tailored test, because what he ought to be doing is putting evidence in that it's a wink and a nod, that it's not truly an independent expenditure committee. And if they are able to prove that, then it's not treated as independent expenditure at all. It's treated as an in-kind contribution to the candidate. And we're not challenging the limits on that. If you did that, if you treated that, I mean, if, in fact, they could prove that there was a wink and a nod, then the faculty or whoever did that or was involved in it, probably the campaign of the candidate would be subject to criminal sanctions, right? That's correct. And it would be treated as a contribution to the candidate. And we're not challenging the contribution limits. Well, you're not an antitrust expert, I gather. What's that? You're not an antitrust expert, I gather. That's right. Although, having gone through Chicago, you probably know a thing or two about it. You know about conscious parallelism in the trust law? I'm sorry, I didn't. Conscious parallelism? Yes. It's a doctrine that has had its ups and downs. But there's something quite short of actual coordination, where you're actually verbally in cahoots with somebody. You know, you have a secret meeting and you say, you know, we're going to do X, Y, and Z together. There's a lesser level of coordination that nevertheless can be quite effective. In this case, there is evidence that they looked at or interviewed on the candidate. Actually, the PAC had direct face-to-face contact with the candidate. So this is not a case where somebody says, you know, I read about this candidate in the newspapers. I know he supports gun control, you know, whatever cause. And so I'm going to work for him. I'm going to start an Internet blog and support him, and I have nothing to do with the candidate. Here they have actual face-to-face. I mean, our candidates show up happily, willingly, hoping to get contributions. Why isn't that evidence enough that even though no actual agreement is reached, the face-to-face meeting and the subsequent reward of one candidate and opposite X to others, basically punishment of others, is enough coordination to implicate this interest? Your Honor, Buckley has told us that it's not. NCPAC has told us it's not. EMILY's List has told us it's not. It's not the involvement in the political process and knowing where the candidates stand. It's coordination on the campaign strategy. But I am talking about coordination. But if you are, then it's not an independent expenditure. By definition, it then becomes a contribution to the candidate. If I had that, and the candidate says to me, you know what, it would really be nice if I had a mailer that pointed out that my kids went to the local school, and, you know, whatever, and, you know, use your money. At that moment, it's no longer an independent expenditure. It's a contribution to the candidate. And if I'm not reporting it as a contribution and the candidate's not reporting it as a contribution, both are subject to criminal prosecution. Does it have to be coordination about the campaign? Let's say this is a PAC that supports gun control. I mean, let's say that's their specific cause. There are those things, right? I mean, one issue PACs. So they interview all the candidates, and they ask them a simple question. Mr. Smith, if you get elected, and if there is a, I mean, let's say there's a bill pending, and you get to vote on this bill that would, come on, for gun control, let's say, whatever the issue is, will you vote in favor of it or will you vote against it? And all the candidates that say yes get the money, and all the candidates that say no get nothing at all. And I can find out the same thing if I go to the candidate's web page. But that's the political process. But it's different when you ask them face-to-face and their money follows. It's one thing to make an announcement, and, you know, this is your campaign promise to the world at large, and then, you know, then you don't keep it. But it's different if you look somebody in the eye and they ask you a specific question. It's sort of like confirmation hearings. That's right. But that's not what the court in Buckley is talking about. And we have to accept that these entities are pure independent expenditure committees, because if they're not, those are deemed contributions. Counsel, let me just ask you this as a matter of curiosity. These contribution limitations have been on the books since 1994, and at least one of the PACs has been around since 1999. If the LBCRA long-reach campaign is such a terrible intrusion, why are your clients now, is there anything you'd like to show why all of a sudden your clients are complaining? Well, they started threatening to enforce it, Your Honor. We thought that it was not applicable against the PACs. So it hasn't been enforced. Because of the Lincoln Club decision, they then threatened to enforce it and told us in a meeting that they were going to enforce it. I thought you were going to say they got a smarter lawyer. No, no, no. You know, there are these ordinances. They were all adopted in the early 1990s. They exist up and down the state. After the city of Irvine objected to our challenge of that in the Lincoln Club case,  and they were all repealed, and so this ordinance, it's identically worded to the one that was at issue in the Lincoln Club. The infrastructure that the chamber has, the main entity that gets the dues into its general operating fund, and some of the dues go to the various PACs, is identical to what was at issue in the Lincoln Club. This court said that it's subject to strict scrutiny. On remand, the district court entered a judgment, and it was a stipulated settlement, but because that ordinance had been adopted by an initiative, they couldn't just settle the case and stop enforcing it. We had to go to Judge Stotler, and she entered a judgment that said it was unconstitutional under the Ninth Circuit's decision in Lincoln Club, and it applied both to the general body and its affiliated PACs. This is identical. And so that they were participating in campaigns until they were threatened with criminal prosecution is because that decision was on the books. Do you have, let's spend a few minutes, some dull civil procedure? Sure. And the like issue, sir. Let me get away from the exciting First Amendment. That's right. Let me take up Judge Wardlaw's question about standing first. That's a good one. The supplemental excerpts of record, paragraph 33 of the complaint, it says the chamber also wishes to become actively involved in other local elections, but is barred by this campaign ordinance. That's sufficient to give us standing. Wait a minute. The complaint, doesn't the stipulated facts supersede the complaint? The stipulated facts only say. Let's decide this on the basis of the complaint. Right. The stipulated facts say that we are not participating in elections in Long Beach, the chamber itself. We're not talking about its affiliated PACs. Because we have that bylaw, but it's also because the stipulated facts say that because our dues are larger than the contribution limit of the ordinance, we are prohibited from participating. The question is, would you be doing it anyway? Why establish these PACs if the chamber thought of itself as about to make contributions and being imminently threatened by enforcement of this statute? Why wouldn't it just make them through the existing committees that it has? Because some of the members of the chamber are governmental entities, and so their dues can't go into the political campaigns. The city of Long Beach itself was a member of the chamber at one point, so they've got this infrastructure set up. It's an association. Some members are allowed to participate in politics, and their affiliated PACs is the way. Why would the chamber itself otherwise participate? Well, the complaint, and this is not contradicted by the stipulation of facts, the complaint says the chamber wishes to become actively involved in local elections, school boards and other elections, but it's prohibited because of these ordinances. But it may wish to do so in the future. Yes. Well, and, Chief, but again, I don't think this matters, because the way the Supreme Court in a number of cases has recommended and the IRS through its regulations has encouraged people to participate in a political process when their entities like the chamber is by creating affiliated PACs, and nobody has made the distinction that that means one has standing and the other doesn't. Well, the only reason this is of any relevance, of course, is because the first order appears to have been only as to the chamber. Then there was a judgment that is more clearly only as to the chamber. And then we have this motion for clarification, so the question ultimately goes to our jurisdiction. That's right. So let me take up the time, because I do think they overlap. So here, let's go back to April of 2006, the preliminary injunction entered by Judge Florence Marie Cooper. It's the enjoined enforcement of the ordinance to the extent they apply to persons or committees not affiliated with any candidate. So the preliminary injunction is clearly applicable to both persons and committees not affiliated with any candidate. This order shall remain in effect until the conclusion of this litigation or until dissolved by further order of the court. Then you get to the April 10, 2007, summary judgment ruling, page 110 in the excerpts. The Long Beach Area Chamber of Commerce, quote, chamber, and its political action committees collectively with chamber, plaintiffs, plural. That's how that's the beginning of the order. Page two, at the end of its summary section, it says, the court rules that Long Beach's ordinance is unconstitutional as applied to the plaintiffs, capital P, plural, picking up on the definition they had given at the beginning. That's both the chamber and its PACs and others similarly situated. Page 15 of that order, page 124 in the excerpts. Therefore, the court holds that the Long Beach ordinance are unconstitutional as applied to the chamber. Now, they're limited to the chamber and others similarly situated. The court grants plaintiffs, plural, motion for summary judgment and significantly denies the defendant's motion for summary judgment. Now, that's the April 10 order. The May 1 judgment talks only about plaintiff chamber of commerce and others similarly situated. We filed within days of that a motion for clarification. Are you just using shorthand? Is others similarly situated encompass the PACs consistent with your summary judgment order? That was rejected because the timing on the notice of the hearing was 21 days and it was mailed and it should have been 24 or something. I don't remember what the exact reason for the rejection was. Defendants, the city, filed a notice of appeal on May 8. They appealed from the order granting the plaintiffs, plural, summary judgment ruling and the order denying defendants motion for summary judgment. Then we get the motion for clarification and for the first time, Judge Gutierrez says that, oh, I meant to say that this was constitutional as applies to the PACs. Now, there's still no order granting their motion for summary judgment. There's still no judgment applying an order granting their motion for summary judgment. All we have is the denial of the summary judgment and their notice of appeal appealing the denial of the summary judgment for them. So I don't know. We could not have taken an appeal back in early May. There was no order in favor of them and against the PACs. There may still not be. If you want to look at that clarification order, it's not. It doesn't end. We therefore grant summary judgment to the defendants. There's no further judgment entered either. That's right. And so what that means is even the original April 10th order, which says summary judgment is granted to the plaintiffs, plural, defined to include the PACs, and then he gets confused later. I have no idea. But even if the confusion later doesn't include the PACs by design, that doesn't grant summary judgment to them. It just leaves the original preliminary injunction still in place as to the PACs. Well, this seems to me like one of those situations where we could remand for entry of judgment so that you could come back up on appeal. But I don't know why we would do that. That's right. Except that the Supreme Court seems to be really becoming much more of a stickler on meeting the time limits. Well, then I would be a stickler on this, that what Judge Gutierrez did on July 12th is by no means a simple clarification, correcting a clerical error under a 60A. He had no jurisdiction to say, I said deny back then, I'm now granting summary judgment, because a notice of appeal had already been filed. That means you're left with the record as it was in early May when that appeal was filed. That's where the jurisdiction of the district court ends, except for those minor cleanup things. And this was not a minor cleanup thing he tried to do. And that judgment says, based on the summary judgment ruling, the plaintiffs were granted summary judgment and the defendants are denied. And you can consider both right now on that ground. And because we've done all the briefing with both of the parties and the PACs, I mean, that would seem to be the best course in the context of judicial efficiency. And I'm not asking you to do that for equity. I think that's the right answer under the law. Well, you're running out of time. Would you just answer the question about Citizens United? Sure. Should we hold for the Supreme Court? You know, I don't think you need to. I think both the Fourth Circuit's decision in Leak and the recent Emmylou's List decision on the D.C. Circuit shows that McConnell is limited to contributions to political parties. It's specifically focused on the close relationship parties have to the candidates. That doesn't alter this line between independent expenditure committees and the candidates at all. And so even if McConnell is retained after Citizens United, it doesn't govern this case. And the likelihood it gets reversed and makes my position even stronger is pretty significant, I think. Thank you. Thank you. I'll give you a minute for a bottle if you wish to take it. Thank you, Your Honor. Just very briefly, it occurs to me that there's not a sense of reality about what goes on in campaigns. This notion that a contribution to an independent expenditure committee is removed from the candidate is technically correct in terms of how those expenditures are defined, but it's not correct in terms of how the real war works. Well, but that's a line that the Supreme Court has drawn. And saying it's a fuzzy line or a line you don't like or a line that doesn't make much sense doesn't help us here because we can't overrule the Supreme Court precedent. So what you've got to do is help us work with the line the Supreme Court has drawn. And everything you say erases the line altogether. It doesn't help us define things on one side or the other. My suggestion would be focus on both McConnell and the Cal Med case because in the Cal Med case, the Supreme Court dealt with a congressional ordinance, a congressional statute that limited contributions to political committees, independent expenditure committees, and it was found facially constitutional. If there was, as Dean Eastman suggests, if there was a First Amendment prohibition on limiting contributions to independent expenditure committees, the Supreme Court could not have found as they did in Cal Med. And that was reinforced, I believe, clearly. Dean Eastman believes not clearly in the now famous footnote 48 in the McConnell case where they emphasize, the Supreme Court emphasizes, that it wasn't merely a concern for pass-through or circumventing the monies given to independent expenditure committees or to candidates. They were concerned specifically with the appearance of corruption when money goes to non-coordinated expenditures and independent expenditure committees.  Okay? Thank you. Thank you very much. This argument stands admitted. We thank counsel for a very fine argument. We are now adjourned. We will remain in place and after a minute or so, we'll give the chance to those who wish to leave. Counsel, if they wish to stay, they can stay or go. They don't need to feel trapped here. We will take questions for about ten minutes. Yes, not concerning any of today's cases. Questions like who wins? No.
judges: Kozinski, Nelson D. W., Wardlaw